STOKER *v.* GROSS.

4-9134                                      228 S. W. 2d 638

Opinion delivered March 20, 1950.

*Cecil E. Johnson, Jr.,* for appellant.

*R. Coker Thomas,* for appellee.

ED. F. McFADDIN, Justice.   This is an appeal from the Little River Chancery Court, Second Division; and the appellant challenges the correctness of the decree rendered by that Court.   The learned Chancellor heard the evidence *ore tenus* and filed a written opinion on which the decree was based.   We copy the opinion of the Chancellor which contains a statement of the issues, synopsis of the testimony of the witnesses, and application of the governing legal principles.

### Opinion of the Chancellor

"This suit was instituted by the plaintiff, Luther Gross, against the defendant, Arthur Stoker, to enjoin the defendant from building a gate across and closing a road running over defendant's lands, and preventing the plaintiff, and the public generally, from using said road.

"The defendant owns a small tract of land, approximating 40 acres, along the western bank of Little River in Little River County.   For more than sixty years a road has, or roads have, traversed said lands.   The main road originally went from Saratoga, Arkansas, to Little River, and from Little River to the old town of Richmond, and was a military road.   In the early days a ferry was operated across Little River to transfer the traffic from one bank to the other.

"In 1938 the CCC authorities, under a contract with the defendant, constructed what is referred to in the testimony as the CCC road, following the most direct path across said land, and being along an old road known as the flat trail or flat road. The testimony is conflicting as to the location of the road leading from the old ferry, or approximately its landing place, across the lands of the defendant. A preponderance of the evidence discloses, however, that there were three roads leading across said lands and their use depended upon weather conditions. There was a road on the South side along the high banks of a slough which was used presumably in wet weather; then, as the wet season moderated, there was a second road across defendant's lands North of this road, leading across said lands, used by the public, and which was a shorter road when weather conditions became better; and then, when the dry season set in, the public generally used the flat trail—or the most direct route across said lands—which was later graded and improved by the CCC authorities. The only road involved in this action is the flat trail or flat road, taken over in 1938 and graded by the CCC authorities; and the issue is: the right of the plaintiff to secure an injunction against defendant enjoining him from closing said road by a locked gate, or otherwise.

"It is evident from the testimony that the lands of the defendant are very low, and along the bank of the river, and of a swampy nature, and that the public, in crossing said lands, had considerable difficulty, depending on weather conditions; but a preponderance of the evidence shows that there were three roads used, as above shown, and that the flat trail or road, built by the CCC authorities, followed a road which had been used by the public for more than fifty years.

"*The plaintiff, Luther Gross,* testified that the CCC road was built in 1938; that when it was first built there was a bridge over Little River where it touches the west bank of Little River, constructed by the CCC authorities, but which bridge was destroyed—shortly after being built—by an overflow of Little River; that he used this CCC

road almost exclusively, after it was built, to conduct his occupation as a licensed commercial fisherman; that the CCC dump was built in height approximately three feet across the defendant's lands; that there were two drains across said lands and that they were bridged by the CCC authorities; that prior to that time timbers were placed in these drains permitting the use of the flat trail in dry weather; that he had traveled that road approximately twenty years altogether; and that recently the defendant had placed a gate across the west side of defendant's lands, blocking said road, and locked same.

"*Lum Starks,* a witness for plaintiff, testified that he had farmed in that community and lived there since approximately 1910, and that the CCC road followed what was known as the old Ward's Ferry road, or the flat trail; that this road after reaching Little River on the east side thereof, went from the east bank of Little River to the town of Saratoga, and was a well-defined road, and was the only method to cross defendant's land in the rescuing of livestock in overflows; that the said CCC road ran across his land; that the CCC road had been graded through the administrations of two county judges; and that the public generally used the CCC road for approximately ten years before this suit was filed. He also testified that there were three roads across the defendant's lands and used as above set forth, depending on weather conditions.

"*Preston Aaron* testified that a road had crossed the defendant's land, being known as the Ward's Ferry road, as far back as he could remember; that he was sixty-four years of age; that he owned lands across the river from the defendant's lands, and had rented from Dierks Lumber Company lands and constructed a cabin thereon and had been intimately acquainted with these lands for the past ten years. He testified that his cabin was immediately West of the defendant's cabins; that to get to his lands it was necessary that he use the CCC road, which he had done since its construction; that he kept a boat on Little River the year around to use in crossing the river; that the traffic generally has been using the CCC road

since its construction; that he rented the Stoker cabin for three years before building his own cabin; and that it would do him an irreparable injury to close the CCC road.

"*M. F. Adkinson* testified that he had worked for Little River County in county highway construction for seven years and was acquainted with the CCC road; that the county had graded it and kept it up under the administration of Judge Lowery and Judge Johnson; and that there was an old road where the CCC road was constructed. •

"*J. E. Taylor* testified that he was eighty-three years of age; that a ferry was operated at the connection of the Saratoga road with a road across defendant's lands sixty-five years ago; that it was the principal military road reaching from Saratoga to Richmond; that the road from the river to Saratoga was maintained by the county and had been for sixty years; and that, as far back as he could remember, the road on this side of the river was the Ward's Ferry road. •

"*Wes Stephens* testified that there were three roads over the Stoker lands; that he had lived in that neighborhood all his life; that he owned a farm in that neighborhood; that he raises hogs and cattle; that to protect his stock, especially in overflows, it is necessary that he use the CCC road; that, as between the three roads, he used whichever road the weather conditions compelled him to use; that the CCC road had been graded since its construction; that he used the CCC road, and Mr. Stoker's man had helped him to do so in moving his stock out of the bottoms; that the CCC road was the only way he had to move his stock out when the river got up. He also testified that he had a gate where the road crossed his lands, but the public generally used the road and it was open to the world; that there was an old wagon road where the CCC road was built over Stoker's lands; that they never asked Mr. Stoker's permission to use the lands; that about the time Stoker closed the road, he told them that they would have to stop using the road or pay him; that Stoker had made no objections prior thereto; that the public used those roads, and did so without asking permission;

and that there were only three roads he knew of across Stoker's lands, and their use depended upon weather conditions.

"*W. D. Lowery* testified that he was County Judge from January 1, 1939, until January 1, 1945, and, as County Judge of Little River County, he caused the CCC road to be graded to the river; that he never talked with CCC authorities about the road; and that beginning with 1932 there was a road across Stoker's lands over which later the CCC road was built, that is, that the CCC road was the same road as the old road.

"For the defendant's case, *Arthur Stoker* testified that he had owned his land about twenty-five years; that the ferry had not been operated over the river for about forty years; that the roads across his lands to the ferry landing crossed all over his lands; that he made no objections to the people generally using the lands; that there were three roads from the Mulberry Landing; that Judge Lowery repaired the bridges over the CCC road; that he made no objections to anyone going in there; and that he personally put gravel on the road.

"*George Taaffe* testified that there were roads all over the Stoker lands; that during the wet season the roads were all over the place; but during dry weather there was a definitely traveled road; that he was first at Stoker's camp about 1923; that as occasion demanded when a road became impassable another one was cut; that this 33 acres was what was called Little River bottom land; that there were no improvements on the Stoker land; that there was a definite road there during the dry season, late summer and fall, but that he did not know where it ran.

"*Robert Sessions* testified that he was County Judge from 1931 to 1938; that as County Judge he worked the road to Lum Starks' place; that he did not know of any court order establishing a road over the Stoker lands; that he had made one trip over the road across Stoker's land from Starks' place to the river; that he was never familiar with this land; that he believed the CCC made arrangements with the county to use their machinery in working the roads they constructed; that finances were

short about that time and he believed that they worked with the WPA and CCC; and that he did not know whether this was a public road or not.

"*E. S. Pickett* testified that he lives near Foreman in Little River County; that he was reared around the 33 acres in controversy; that they went down different roads across these lands to the river; that he left there in 1919 and had visited there three times since; that the last time was after the CCC road had been built; that there was a road known as the flat road; and that there was approximately fifty years' use of the flat road over which the CCC road was built before the construction of the CCC road.

"*George McDowell* testified that the road across the defendant's land ran to the river and was a dead end road at the river; that the ferry ceased to operate about forty years ago; that there were three roads over the defendant's lands, one being what is known as the flat road; that when it got 'boggy' they drove where they could; that he was there once a month prior to the construction of the CCC road, and that the CCC road was built over what is known as the flat road; and the flat road had been in use for approximately fifty years.

"The defendant introduced his contract of lease with the CCC and the relinquishment of the contract.

"It is my opinion that a preponderance of the testimony shows that, depending on weather conditions, there were three well-defined roads across the defendant's lands: one being on a high bluff on the south side, used in wet weather; one being north of this road and between this road and the CCC road and used when weather conditions improved, being shorter than the first mentioned road; and the last being what is known and referred to by witnesses as the 'flat road', and being the nearest route across the defendant's lands to the river; that the public generally is interested in the use of the 'flat' or 'CCC' road; that the flat road had been in use for more than fifty years before the CCC road was graded and raised over the flat road; that in dry weather, before the CCC road was built, even cars could travel the flat road, as

there were depressions, but by putting timbers over the low places this could be done; then, when the CCC road was built, it lifted the flat road about three feet and bridged these places, and perhaps County road machinery was used in building this road; that the public generally used the flat road for fifty years or more, and used the CCC road for ten years, before any question was raised as to the right of the public to use this road.

"In my opinion this testimony clearly established that the public, by prescription, acquired the right to use this road, being first the flat road and later the CCC road. No one during all those years ever questioned the right of the public to use this road as a public road, not even the defendant after he acquired title to the land.

"It is my opinion that the contract entered into between the defendant and the CCC authorities was a private contract between them, and evidently it was the intention to build and use this road as a public road after it was built and graded and raised with public funds, and that it would be used to a greater extent today had the bridge not washed out. This road is a public road reaching back to Civil War days; the right of the public to use this road—because of a use for more than sixty years—is now beyond question. A decision of this case, in my opinion, is governed by the case recently decided by the Supreme Court: *Martin* v. *Bond, Trustee,* 215 Ark. 146, 219 S. W. 2d 618."

We conclude from a careful study of the transcript and the briefs, that the learned Chancellor was correct; and we therefore adopt his opinion as our own.

Affirmed.

ED. F. McFADDIN, Justice, on rehearing. In his petition for rehearing, appellant earnestly insists that both the Chancellor and this Court have ignored evidence to the effect that at a point a mile distant from appellant's land, another land owner had erected a gate over the road in question; and appellant argues that such other gate gave the appellant the right to erect the gate in question in this suit. In support of such contention,

appellant cites *Porter* v. *Huff,* 162 Ark. 52, 257 S. W. 393; *Mount* v. *Dillon,* 200 Ark. 153, 138 S. W. 2d 59; and *Kennedy* v. *Crouse,* 214 Ark. 830, 218 S. W. 2d 375. In each of the cited cases the Court was discussing the gate over the road there in question, and not another gate erected by another land owner some distance down the road from the gate in the suit.

We cannot weigh appellant's action in erecting the gate over the public road, as here involved, by what some other person did at another place on the road. Possibly the other gate should have been challenged, but we are not deciding that point. We merely hold that the appellant had no right to erect the gate in this suit; so the petition for rehearing is denied.