MARTIN *v.* TERRELL.

5-1702                                                    318 S. W. 2d 607

Opinion delivered December 15, 1958.

*James C. Cole,* for appellant.

*Joe W. McCoy,* for appellee.

GEORGE ROSE SMITH, J. This is a suit by the appellees for a mandatory injunction to require the appellants to remove two fences that they have erected across what is asserted to be a public road. The chancellor granted the relief prayed. Substantially the only contention made on appeal is that the maintenance of a gate across the road for many years compels the conclusion that the public's use of the way has been merely permissive.

The several parties all own farm land on what is known as Morrison Island or Watermelon Island. This so-called island consists of twelve or thirteen hundred acres lying between the Ouachita River and an old river bed that is now a slough. For a good many years the various landowners have, by common consent, maintained a single fence around the entire island.

The great weight of the evidence shows that the road in question has existed for seventy-five years or more. It provides access to the island from a nearby county highway. The road enters the island through a gate in the perimeter fence, crosses the land owned by the appellant Martin, and runs thence to lands owned by the four appellees and others. Throughout its life the road has been used by the landowners of the island and by the general public; at times it has been worked upon by the county. If it were not for the gate at the entrance to the island there would be no good reason to doubt the public's prescriptive right to use the road.

This dispute arose when Martin, and the other defendants at his direction, placed two fences across the road at points on Martin's land. In insisting that the long-continued existence of the gate entitles him to close the road Martin relies upon our settled rule that the public loses its prescriptive right in a road when it acquiesces for more than seven years in a landowner's maintenance of a gate across the road. *Porter* v. *Huff*, 162 Ark. 52, 257 S. W. 393. The reason for the rule, as we observed in the *Porter* case, is that the gate gives

notice to the public that they pass through the land by permission of the owner and not as a matter of right.

To apply the rule to the particular facts of this case would extend it beyond the reasoning on which it is based. To begin with, the gate was not situated on the land that Martin owns; so the gate could hardly be regarded as notice to the public that their passage across that particular land was by permission of its owner. Upon somewhat similar facts we held, on rehearing, in *Stoker* v. *Gross*, 216 Ark. 939, 228 S. W. 2d 638, that a landowner is not entitled to close a road across his land merely because another landowner has maintained a gate at a different point on the road. See also *Holmes* v. *Pierce County*, 121 Wash. 56, 208 P. 7.

The proof does not support Martin's effort to distinguish the *Stoker* case on the ground that here Martin's predecessor in title, Henry B. Means, Sr., mistakenly believed that the gate was on the land that Means owned. Means acquired the land in 1915 and owned it until his death in 1950. The gate was near the Means barn and was sometimes referred to as the Means gate, but it was actually on adjoining land owned by the appellee Sibley. Coley Buck, who supervised the Means farm for thirty-four years, testified positively that Means never laid claim to the land where the gate is. G. R. Sibley and Charles Crow gave similar testimony. Henry B. Means, Jr., evidently believed that the gate was on the Means land, as he once kept the gate locked for two or three days, but he frankly admitted that his assumption was based on hearsay. On the whole record we are not convinced that the elder Means relied upon the gate as a protection against the creation of an easement.

In the second place, the gate was not maintained even by its owner as a means of asserting his dominion over the road. There is abundant evidence that the perimeter fence, including the gate, was kept in repair by the community as a whole, to protect the island lands against the intrusion of cattle during the crop seasons.

Everyone concerned helped in the maintenance of the fence, the gate, the bridge across the slough, and even the road itself. We are by no means persuaded that the various landowners, in assuming their fair share of the responsibility for the fence, the gate, the bridge, and the road, had the slightest notion or intention of demonstrating by their maintenance of the gate that their use of the road was merely permissive. It is much easier to believe that they used as a matter of right the facilities that they themselves had created.

Affirmed.