CLAUDE E. BROOKS ET UX *v.* T. D. REEDY, COUNTY JUDGE ET AL AND J. H. ROBINETTE, INTERVENOR

5-3848                                          407 S. W. 2d 378

Opinion delivered October 31, 1966

*Robert W. Henry,* for appellants.

*Francis T. Donovan,* for appellees.

CARLETON HARRIS, Chief Justice. The questions in

this litigation, as presented to the trial court, were whether a certain road, either by dedication or by prescription, had become a public road, and, if so, whether the road subsequently, because of the acts of appellants, lost its character as a public way. Claude E. Brooks and wife, appellants herein, instituted suit in April, 1965, against T. D. Reedy, the County Judge of Faulkner County, two of his road employees, and two landowners, seeking to enjoin the judge and road crew from working a particular roadway which runs through appellants' lands; they further asked that the road be declared a private road. This roadway in question traverses the Brooks' farm in a generally east to west direction, the west end thereof being at appellants' home. In the briefs, it is referred to as the Oak Grove Road. To the immediate east (of the lands owned by appellants), Carrell E. White and wife own 160 acres, and J. H. Robinette owns 40 acres lying adjacent to, and north of appellants' eastern-most lands. Robinette intervened in this lawsuit, and, like appellees, pleaded that the roadway is public, and both appellees and intervener asked that it be declared a public road, and that appellants be enjoined and restrained from blocking same. After a lengthy trial, in which over 30 witnesses testified, the Chancellor took the matter under advisement, and on September 15, 1965, rendered an opinion holding that the road in question was a public road; that there had been no abandonment of the road by the public, or county officials; that appellants should be enjoined from interfering with the maintenance of the road by the County Judge and road crew, and the complaint should be dismissed for want of equity.[1] From the decree so entered, appellants bring this appeal.

---

[1]Pertinent portions of the trial court's opinion are as follows: "This is another in a series of cases between these parties, ostensibly about the road, but actually involving other matters. However, the case is presented as a road question and will be decided as such. "The law of this state is in an unfortunate condition in that the cases hold that the public and private individuals lose their easements, if not formally dedicated, by the maintenance of gates for the period of limitations. This makes necessary lawsuits between people who have no objection for gates being maintained for fear

Because of the view that we take, there is no necessity to discuss the question of whether the road under litigation ever reached the status of a public road. We think that the decisive question here is whether such road, if established as public, remained so under the facts hereinafter enumerated.

It might be stated, however, that we do not think the evidence established a dedication, and, in fact, the court did not so find. Accordingly, our discussion will be based on the premise that the testimony established that the roadway in question, through long use by the general public, i. e., by prescription, had attained the identity of a public thoroughfare.

The testimony reflects that there were three gates across this roadway, one at the east end of the land, one

---

of losing their easement and as a result of loss of population, depreciates the value of isolated tracts of land. The law as I understand it in other states is that the maintenance of gates across the easement for the statutory period only gives the right to maintain the gates and does not terminate the easement.

"Without reciting the applicable cases with which all of you are acquainted, I am making the following findings:

1) The road in question is a public road connecting two main county roads and running past the old Oak Grove school house. It was established at least as early as 1908 according to the evidence. In view of later findings, it is not necessary that I determine whether this road was established adversely or by a dedication. It is true that there is no formal dedication of record, but I cannot conceive of the public adversely establishing this road to the school house and the houses along the road. It appears far more probable that the land owners gave the road and that there was an acceptance by the public even though not recorded.

2) The evidence shows no abandonment of the road by the public or the county officials charged with the duty of maintaining the road and bridges.

3) The gates or wire gaps maintained by plaintiffs and their predecessors in title have not been maintained with such continuity and intent for any definite seven-year period such as would destroy the rights of the public to travel and maintain the road. * * * Any interruption of the maintenance of the gates, such as leaving the gates down in the winter so that the cattle could use the open range, or the use of the road at a time that the gates were down would be such as to make maintenance of the gates for a new period necessary."

about halfway through the land, and one near the home of appellants at the west side of the land. There is a great deal of evidence that these gaps were placed across the road long years ago, and certainly, we think the preponderance of the evidence clearly established that, at least as far back as 1952, the date that Brooks took possession of the lands,[2] fences were standing, with gaps or gates[3] across the roadway. The testimony was in dispute as to whether these gates remained closed, or were, at times, open, the largest number of witnesses testifying that they were always closed, a few testifying that they were always open, and still others testifying that the gates were sometimes open, and sometimes closed. Many of the people who testified had occasion to use the road only a very few times, and this occurred over a period of several years. But it is, we think clearly established that the gates were in existence at all times from 1952 on, whether up or down.

In November, 1958, Mr. Brooks filed a petition with the County Court in which he asserted that the road was not a public road, and was used only once a year for a homecoming at the old schoolhouse, and he asked that the court enter its order, declaring the road closed. The County Judge entered the order, but it was subsequently voided by the Circuit Court for the reason that statutory requirements for closing a road had not been complied with.[4] Appellees vigorously argue that, if Brooks was so certain that this was not a public road, and that people using the road were only doing so by

---

[2] When the farm was purchased in 1952, it was purchased in the name of appellant's (Mr. Brooks') father, for the reason, according to Brooks, that he did not have the income to obtain the loan in his name. The witness stated that he had a contract with his father to purchase the place, and that he had made all of the payments on the father's purchase, except for one or two payments initially made by the elder Brooks to George Jones, from whom the farm was purchased. This is not disputed. Brooks obtained record title in 1961.

[3] These gaps were made of two posts with four or five wires between them, and were laced with wire.

[4] It does not appear that Brooks consulted or retained an attorney on this occasion.

his permission, there would have been no necessity to file the aforementioned application. Appellees construe this as an admission that the road was a public one. While, of course, this is a circumstance to be considered in connection with all other evidence, we do not consider this evidence to be decisive or conclusive in the matter. It is not unusual for one to take all steps possible to strengthen his position, even to the extent of taking unnecessary or superfluous action, but if this be a well-founded argument, there is an argument just as potent on the other side. In 1965, the County Judge entertained a petition (apparently instituted by some of appellee landowners) to open a new road approximately a quarter of a mile north of the Brooks home. Appellants argue that, if the road here in question was a public road, there was no reason to endeavor to open a new one just a quarter of a mile away.

Appellees also state in their brief:

"There, of course, is another important feature, and that is that the proof shows that the County of Faulkner had maintained this road through the years from 1908-1966."

We do not agree with this argument for two reasons. In the first place maintenance of the road by the county does not make the road a county road. In *Craig* v. *O'Bryan*, 227 Ark. 681, 301 S. W. 2d 18, we said:

"* * * Joe Price, a county employee, testified that the road had been worked occasionally by the county since 1935, but he did not know whether this was done because of the requests of property owners. The evidence does not reflect any order of the County Court establishing this as a public road, and the mere fact that the roadway was occasionally worked by the county would not, of course, make it a county road."

The proof as to the maintenance of this particular road since 1952 could hardly reach the category of even

"occasionally." The evidence reflects that that portion of the road on the Brooks property was graded in 1954, and again graded in 1959. An effort was made to grade the road in 1965, but Brooks would not permit this to be done. Also, the grading in 1954, and in 1959, by the county, was done at the request and for the convenience of citizens who desired to attend the annual homecoming, heretofore referred to.[5] Grading a road every five or six years can hardly be classed as "maintaining a road."

The learned Chancellor was correct in stating that Arkansas cases hold that, even where an easement has been acquired by prescription, the public and private individuals lose such easement, if the owner maintains gates for the period of limitations. He was also correct in stating that this is different from the decisions in some other states, which hold "that the maintenance of gates across the easement for the statutory period only gives the right to maintain the gates and does not terminate the easement."

We think two of our cases are decisive and controlling in this litigation. The first is *Porter* v. *Huff,* 162 Ark. 52, 257 S. W. 393, decided in 1924. The other is *Mount* v. *Dillon,* 200 Ark. 153, 138 S. W. 2d 59, decided in 1940. The latest case quotes the first, as follows:

"* * * It is unnecessary to decide whether the public acquired a right to the use of the road as a public road by prescription or seven years adverse possession, for it lost any right it may have acquired by acquiescing in a permissive use thereof for a period of more than seven years after the road was closed by gates. When appellee inclosed his land and placed gates across the road, it was notice to the public that thereafter they were passing through the land by permission, and not by right. The undisputed evidence shows that these gates were maintained by appellee across the road for ten or

---

[5]Brooks, in his petition to the County Court, stated that he had no objection to the road being used for that purpose.

eleven years, without objection on the part of the public.''

Apparently, in the case before us, the Chancellor's holding was based upon the fact that he found that the gates, though present, were not always up, *i. e.,* closed. Brooks testified that he never left the gates at either end down (or open), and, also, that he did not lock them until 1965. He said that he had never locked them before, ''because they didn't abuse my rights of the land;'' that he had not objected to the public use as long as they ''put the gaps up as they went through.'' It may well be that those using the roadway did not always put up the gaps; however, be that as it may, the important fact is that the fence and gates were in place for the statutory period, and, under the language in *Mount* v. *Dillon, supra,* the fact that the gates were not always closed does not make any difference. In detailing the facts of that case, this court recited from a stipulation as follows:

''The road crosses the lands of the plaintiffs, so that each of the plaintiffs owns lands on both the north and south side of said road and the said road terminates at the east line of the Woods' property, where it intersects the above-mentioned public road and mail route; that from 7 to 15 years ago, wire gates were placed across the road in three places, namely: at the east side of Woods' property, at the boundary line between the Woods' property and the Mount property, one-quarter of a mile west from the first gate and another gate one-quarter of a mile west from the last-mentioned gate. These gates were so constructed that they could be opened at one side and permit passage through the same. Anyone traveling the road during this period would open and close these gates in passing through. The gates were erected and maintained by the plaintiffs. The defendants, who live in the vicinity, are the principal persons who have occasion to use said road; *that said gates did not remain closed continuously, but were left open*

*during certain seasons of the year, especially during winter months.*[6]

"Some time in March, 1939, a question arose between the plaintiffs and the defendants as to the right of the plaintiffs to maintain said gates across said road, whereupon the plaintiffs fastened said gates so that they could not be opened and closed, thus obstructing passageway through said road and making passage impossible without cutting and removing the wire fence."

The italicized portion makes clear that the gates were not always closed, and the word "especially" likewise shows that the gates were open at times other than the winter months. The *Mount* case was decided here in 1940, so it is equally clear that the rights of Mount, as declared by this court, were not based upon the fact that the gates were kept fastened for as much as seven years.

We hold that the gates in question were placed on the roadway at least as early as 1952, and that they have been maintained since that time. As stated in *Mount*:

"* * * When appellee inclosed his land and placed gates across the road, it was notice to the public that thereafter they were passing through the land by permission, and not by right."

The decree is reversed, and the cause remanded for further orders not inconsistent with this opinion.

[6] Emphasis supplied.