PAULINE ADAMS HARPER *v.* ELGIN C. HANNIBAL ET UX

5-4009                                                                 408 S. W. 2d 591

Opinion delivered November 28, 1966

*Smith, Sanderson, Stroud & McClerkin,* for appellant.

*Autrey & Goodson,* for appellee.

Guy Amsler, Justice. The appellees, Elgin C. Hannibal and his wife Gladys own and reside on a 150 acre farm-ranch located inside the horseshoe formed by "Adams cut-off lake" in Little River County, Arkansas. Due to a change in the river channel caused by flood waters some years ago the land is presently situated on the Miller County side of Red River. Appellees' property is located in Section Twenty-Six (26), Township Thirteen (13) South, Range Twenty-Seven (27) West.

Appellant, Mrs. Pauline Adams Harper, owns considerable acreage to the west and south of appellees in Sections Twenty-Seven (27) and Thirty-Four (34), Township Thirteen (13) South, Range Twenty-Seven (27) West. This litigation involves the use of a road that runs from appellees' home across appellant's farm and out through her barn yard to a public road that connects with "the loop road," near appellant's home.

Appellee, Elgin Hannibal, purchased his land in two transactions—one parcel in 1937 and the other in 1944. Title to the Harper land has been in appellant's family for over 100 years (Mrs. Harper was a daughter of L. C. Adams, the previous owner). Appellees moved into an old house on their property in early 1946 and later built a new home. During the period that Elgin Hannibal was in the military service in World War II his brother Fred (now deceased) looked after the place for him and proof is that by permission of Mr. Harper (appellant's deceased husband) Fred, at times, used the road in dispute.

At the time appellees moved onto their porperty it

could be reached from the north over the Shults place or across the Harper plantation. In 1947 the road leading north "caved" into the river and thereafter the only access to appellees' property was over the Harper farm. There were some half dozen gates, cattle guards and gaps between the first gate near Mrs. Harper's home, and the gate farthest north which was on the property line between the parties. Some of these gates were kept closed all of the time and others only during periods when cattle were grazed in certain areas. There were times when one (or more) of the gates was kept locked, when Mr. Harper who died in 1957 was living, wih all parties having access to a key or keys.

The road across appellant's farm, which is referred to as "originally being a log road", is now (and has for many years been) used daily by appellees and their families and friends. Elgin Hannibal (one appellee) works at the Red River Arsenal and travels over the road twice each work day in going to and from his employment. Appellees have three children of school age who travel this route to reach the school bus that runs close to appellant's home. The road is also used in transporting stock and farm products to market and for such other travel as is normally done by an average family and their friends.

Effective April 15, 1965, appellant gave appellees notice that she would no longer permit them and their visitors to pass through the gates and other enclosures on her land, and that if they undertook to do so they would be considered trespassers.

Thereafter appellees instituted proceedings in equity seeking injunctive relief against appellant and alleging that a public and private easement across appellant's lands had been established because:

(a) The prescriptive use of plaintiffs and their predecessors in title and by the public for over 40 years.

(b)   It has been worked by the county (Ark. Stat. Ann. § 76-101).

(c)   Of Ark. Stat. Ann. § 76-104 relating to most direct route to the County Courthouse of 10 or more families.

(d & e)   It is used as a mail and school bus route (Ark. Stat. Ann. §§ 76-105 and 106).

(f)   It constitutes a way of necessity.

(g)   Defendant (appellant) is estopped because of:

". . . . the long and continued reciprocal use of the said roadway by the Defendant and her predecessors in title across the said lands of the Plaintiffs to that portion of the lands of the Defendant and her predecessors in title north of Adams Cut-Off Lake in the said Section thirty-five (35) above described."

(h)   "An easement in favor of the Plaintiffs has been established by estoppel as a result of the Defendant and her predecessors in title encouraging the said Plaintiffs to make substantial improvements upon the said roadway from time to time and to expend at one time an amount in excess of one thousand five hundred ($1,500) dollars for gravel and grading work on the roadway on the Defendant's lands."

(i)   "The Defendant and her predecessors in title have granted a perpetual easement in the said roadway to the Plaintiffs and their successors in title and the same has been taken out of the Statute of Frauds by part performance by the Plaintiffs in their expenditure of substantial sums upon the said roadway and in their continued use of the said roadway for more than twenty-five (25) years under claim of right."

The relief sought was that appellant be enjoined temporarily and finally from:

> "interfering with the use of the said roadway for ingress and egress to and from Plaintiffs' home and lands by the said Plaintiffs, their children, and the Plaintiffs' social and business invitees."

that she:

> "be restricted to the use of only such cattle gaps, cattle guards, and cattle gates as may be reasonably necessary for her use of said lands; that Plaintiffs be permitted, at their expense, to construct suitable cattle guards in said roadway as replacements for cattle gaps and gates found to be reasonably necessary for the Defendant's use of her land and that said Plaintiffs be allowed to make reasonable maintenance and repairs to said roadway."

and that she be:

> "restrained from interfering with the maintenance and repair of said roadway by Miller County, the State of Arkansas, or any other Local or State Governmental Unit which is willing to perform maintenance and repairs to the said roadway."

Prior to trial the parties agreed that the road running from the "loop road" to the mail boxes located near appellant's home was a public roadway so that the controversy is reduced to a dispute over that part of the traveled way extending from the appellant's front yard, across her farm to the property line between the parties.

The lower court issued a temporary order on April 14, 1965, and then on the following January 17th issued its final decree granting appellees substantially the relief sought. The case is here on timely appeal.

Appellant relies on four principal points for reversal and appellees cover three points in their brief.

In our view the two crucial questions in the case are whether appellees have established a prescriptive right to use the roadway and whether appellant is estopped to deny appellees passageway over her property.

The attorneys have, in their excellent briefs, cited literally dozens of authorities from this and other jurisdictions and to undertake comparing, distinguishing and analyzing all of them would be redundant and add little of value to our opinion.

In considering the question of appellees' claimed prescriptive right we are at the outset confronted with a brief statement contained in the opinion of Special Justice Sol F. Clark in *Johnson* v. *Lewis,* 47 Ark. 66, 14 S. W. 466, where in commenting on the acquisition of a prescriptive right across another's land he wrote: "It should be occupied and used as a right, and not merely as a favor or privilege granted by the owner of the servient lands."

The Supreme Court of the State of Washington stated the rule more succinctly:

"A user which is permissive in its inception cannot ripen into a prescriptive right, no matter how long it may continue, unless there has been a distinct and positive assertion by the dominant owner of a right hostile to the owner of the servient estate." *Northwest Cities Gas Co.* v. *Western Fuel Co., Inc., et al,* 123 P. 2d 771.

And our own court in the late case of *Still* v. *Still,* 239 Ark. 865, 394 S. W. 2d 733, said:

"It is well settled that the holding of land by permission can not ripen into an adverse or hostile right until notice is brought home to the owner and holding has continued thereafter for the statutory period. *Fry* v. *Grismore-Hyman Co.,* 151 Ark. 44, 235 S. W. 373; *Fulcher* v. *Dierks Lumber & Coal Co.,*

164 Ark. 261, 261 S. W. 645; *Harp* v. *Christian*, 215 Ark. 833, 223 S. W. 2d 778; *Bailey, Trustee* v. *Martin*, 218 Ark. 513, 237 S. W. 2d 16.''

For cases from other jurisdictions see Adverse Possession Key No. 60, American Digest System.

The legal principle being well established we must then determine how the law squares with the facts in the case at bar. In reality there is not a great measure of factual difference reflected by the evidence.

Appellee Elgin C. Hannibal's brother Fred had looked after Elgin's farm while Elgin was away on military duty and during that time had arranged with Mr. Harper (appellant's deceased husband) to use the farm road in dispute. Elgin knew of this arrangement. It appears that this road also caved into the river once or twice and that Elgin, with Mr. Harper's permission selected another location and had some work done on the new road. Appellees say they never discussed the use of the road with appellant.

A review of the evidence of witnesses for both parties points up the fact that appellant at all times undertook to maintain constant control over the use of the road in question.

A witness for appellees who ''worked a little bit'' of their land in 1950 used the road across the Harper property for traveling back and forth while doing the farming. He was asked, ''She (Mrs. Harper) rides herd on that road pretty closely, does she not?'' His answer was, ''I think so.''

Another witness for appellees, who had known the parties and their farms since he was eight years old and whose father had leased the Hannibal land some years back, now lives on Route 4 out of Texarkana. He stated that during the fishing season, ''I'd go back over there all the time to visit the Hannibals or fish.'' Then:

"Q. Have you had any difficulty in driving over there to the Hannibals any of the time since you have been going over there getting through the roadway?

A. You mean difficulty from them or the road, or what?

Q. Yes, Mr. Harper or Mrs. Harper?

A. I've been stopped about going in there; I mean, they never did just tell me absolutely I couldn't."

This witness also testified that he didn't believe that Mrs. Harper had ever caught him going in, but that Mr. Harper would tell him it was a private road, "but he never did just tell us we absolutely couldn't go through."

Appellee Elgin Hannibal testified that some of the gates were closed part of the time and that one (perhaps two) was closed all the time. A significant bit of evidence by this witness was adduced to the effect that he cautioned his visitors to not leave gates open:

"Q. That's people who came in to see you and your ownself?

A. Yes, sir, and all the people that come to see me I said, 'Take care of Mrs. Harper's gates; don't let nothing in or out.' "

A witness for appellant (defendant below) who bought some timber from appellees in 1962 was concerned about a route for hauling the timber out so he discussed the matter with appellee, Elgin Hannibal. He testified:

"Q. At that time did you and he have a discussion as to how you could haul the timber out, the logs out?

A. Yes, sir.

Q. As nearly as you can, relate the conversation, the words you used, and the words Mr. Elgin Hannibal used at that time, about how you were going to haul the logs out.

A. I asked Mr. Elgin how I was going to haul that timber out, and he said, 'Back up the road there.' He said, 'The old road that you came in there before, it's all in the river. You will have to go out through Mrs. Harper's place.' I said, 'Do you mean to tell me' I says, 'all those gates is posted?' He says, 'She doesn't mind it.' I said, 'But the road goes right through her yard.' He says, 'She doesn't mind it.'' He says, 'You can ask her; she is a mighty nice lady. I don't think she will object.' I did ask Mrs. Harper, and she gave me permission.''

Appellees say the county did work on the road and this appears to be true but there was never any effort by the county judge or appellees to comply with statutory requirements for establishing a public road. It is to be noted that even with respect to this work the determined will of Mrs. Harper was controlling.

Judge B. B. Lanier, who served as Miller County Judge from 1953 to 1963, after explaining that he arranged with Mrs. Harper to straighten the road leading from the loop road up to her house (and for making a turn around) testified:

"Q. She said she didn't want a public road in where now?

A. On into her farm.

Q. From what spot?

A. From the gate.

Q. Turn-around gate?

A. From the turn-around gate.

\* \* \* \*

"Q. What instructions did you give your road crew about going beyond the turn-around road that you talked about?

A. I told them to talk to Mrs. Harper; I didn't want to get crossways with her, and she told me what to do and that's what I did."

Members of the road crews that worked under Judge Lanier and other county judges with rare exceptions testified that they graded the road in dispute only when told to do so by the county judge.

Perhaps the most damaging circumstance against appellees is the continued maintenance of gates across the roadway by Mrs. Harper. It is undisputed that the gates (and "gaps") were there and that some, if not all, of them bore "Posted—No Trespassing" signs.

In the ancient case of *Jones* v. *Phillips*, 59 Ark. 35, 26 S. W. 386, this court dealt with a problem very similar to the one confronting us here. From 1860 to 1884 or 1885 a road passed through the fee owner's field (Jones) with a gate where the road entered the field and a gate as the road left the field. Sometimes the gates were locked with keys furnished the owner's neighbors who would use the road; other times the gates were not locked and anyone could use the road who pleased.

The trial court decided that the public had acquired prescriptive rights to use the road. In reversing, this court said in part:

"But while they permitted the public to thus use this piece of road through their field, there is no evidence that they surrendered any of their rights or dominion over the same in any manner whatever, but continued at all times to exercise just such con-

trol over the same as any farmer would over a private road through his plantation, which he is willing that his neighbors and such of the public as chose to do should make use of for their convenience.

\* \* \* \* \*

"The owners of this property have never ceased to keep gates or fences where it (that is, the road) enters this field on either side. They have, therefore, never ceased to exercise dominion absolute or qualified over this passageway. The public, therefore, cannot be said to have held at any time adversely to the owner."

We think the rationale of *Jones* v. *Phillips, supra*, is sound and that it is controlling in this case regarding the prescriptive rights claimed by appellees.

Appellees say that appellant is estopped because they (appellees) spent $1,500 or more in improving the road over the years that it has been used by them and that appellant "stood by" and knowingly permitted them to expend this money. Appellees' own proof refutes this contention. When Elgin Hannibal was asked if he said anything to Mr. or Mrs. Harper about putting gravel on the road he replied, "No, sir. Never said anything about it." Again, "I don't think I said anything to nobody—I didn't discuss it with anybody but the man who hauled the gravel." He also testified that Mr. Harper saw the gravel after it was spread, but whether this information was conveyed to Mrs. Harper is not revealed. It seems clear that the road was improved for appellees' convenience rather than for the purpose of establishing any claim of right antagonistic to appellant.

A recent case involving the creation of a prescriptive right by estoppel is cited by appellees, *Craig* v. *O'Bryan*, 227 Ark. 681, 301 S. W. 2d 18. The Craig case is easily distinguished on the facts. A turn-row road ran across Craig's open field (no gates). This road was the only access to an area on "Old River" where a number of landowners wanted to construct homes. They revealed

their desires to Mr. Craig who granted them permission to cross his farm. Relying on this assurance these people graveled the road and expended large sums in constructing homes on the lake front. We held under those circumstances that Craig was now estopped to deny the lake-shore owners use of the road. In the case at bar appellees claim no assurances or promises from appellant.

We have said that estoppel may be invoked when a party who, "by his acts, declarations or admissions, either deliberately or with willful disregard of the interests of another, induces him to conduct or dealings which he would not have otherwise entered upon is estopped to assert his rights afterwards to the injury of the party so misled." (citing authorities) *Thomas* v. *Spires,* 180 Ark. 671, 22 S. W. 2d 553.

In the same opinion is this statement, "The underlying principle is that the conduct of the party misleading the other involves fraud, and the remedy is available for the protection of the party induced to act to his injury by reason of the fraudulent conduct and declarations of the other."

We are convinced that a preponderance of the evidence does not establish an estoppel against appellant.

The fact that appellees have no other access to their home doubtless weighed heavily on the conscience of the good chancellor. However, the proof is simply not sufficient to justify granting appellees relief under the rule governing "a way of necessity." *Craig* v. *O'Bryan, supra,* and cases there cited.

Accordingly the case is reversed and remanded. The Chancery Court is reinvested with jurisdiction for allowing appellees a reasonable time within which to pursue the statutory method [Ark. Stat. Ann. § 76-110 et seq. (Repl. 1957)] for establishing a private road that will afford them ingress and egress. *Quality Excelsior Coal Company* v. *Reeves,* 206 Ark. 713, 177 S. W. 2d 728.