Tʜᴏᴍᴀs HOOVER ᴇᴛ ᴜx *v.* Fʀᴇᴅ SMITH ᴇᴛ ᴜx

5-5212                                                451 S. W. 2d 877

Opinion delivered April 6, 1970

*Fred Pickett,* for appellants.

*William H. Howell* and *George Steel,* for appellees.

JOHN A. FOGLEMAN, Justice. Appellants and appellees are adjoining property owners, the lands of appellants lying east of those of appellees. Both tracts are bounded on the north by Little River. Appellants acquired their property in 1963. Their predecessors in title had owned it since 1929. Appellees have owned their property since 1937.

This controversy involves the right of appellants to continue to use a roadway across the lands of appellees as a means of ingress and egress. This way enters appellees' property at the extreme southwest corner thereof where it intersects a county road. It meanders northerly along the west boundary of appellees' land to Little River, thence easterly along Little River to an old ferry landing, then to a campground and, finally, to the boundary between appellants and appellees. It has been in existence many years and was used by appellants and their predecessors in title as their primary means of ingress and egress until November, 1968. The preponderance of the evidence supports the chancellor's finding that it then constituted the only feasible means of access to appellants' lands. At least 10 years ago appellees enclosed their lands by fencing the entire tract. A wire gap gate was then placed and has been subsequently maintained across the roadway at its juncture with the county road. In November, 1968, appellees replaced this gate with a metal gate, which they locked. Thereafter, they refused passage across their lands to appellees. There was also a gate at or near the boundary line.

Appellants brought this action to enjoin appellees from denying them use of the roadway, claiming an easement for ingress and egress based upon prescription.

Appellees defended upon the ground that any prescriptive rights acquired by the public or by appellants had been lost and that no one had the right to cross their lands except by permission.

The preponderance of the evidence supports the chancellor's finding that the public established prescriptive easements across appellees' property, at least as far as the ferry site and old campgrounds. It also supports his finding that at least a private easement by prescription existed from the old ferry site to appellants' lands. The chancery court, however, denied relief to appellants because it found that gates were erected and maintained by appellees for more than seven years, not only to keep cattle enclosed, but for additional reasons sufficient to bar any use of the roadway by appellants as a matter of right.

Appellants assert that abandonment of their prescriptive rights was not shown by a preponderance of the evidence, and that failure of appellants to take steps to remove the gates within seven years did not constitute a bar to present relief. They argue that no clear intention on the part of appellees to obstruct passage over the road was evidenced until the gate was locked.

It is clearly established that erection and maintenance of a gate by an owner does not give notice that subsequent use of a way across his lands is permissive and not as a matter of right, unless it was maintained as a means of asserting the owner's dominion over the road. *Martin* v. *Terrell*, 229 Ark. 787, 318 S. W. 2d 607. The placing of a temporary device across a roadway for the purpose of restraining livestock, but not for the purpose of obstructing an adjoining owner or the public in the use of the road, is not sufficient to interfere with the reasonable enjoyment of a right to use it. *Hockersmith* v. *Glidewell,* (Ark., 1913), 153 S. W. 252. On the other hand, it is well settled that erection and maintenance of a gate or a wire gap across a road, by an owner, when his purpose is not merely

to restrain livestock, constitutes notice to the public that, thereafter, any travel upon the road is by permission of the owner and not as a matter of right to the public or to any individual traveling the road, even though the gate or gap may be left open during certain seasons. *Porter* v. *Hugg*, 162 Ark. 52, 257 S. W. 393; *Mount* v. *Dillon*, 200 Ark. 153, 138 S. W. 2d 59; *Kennedy* v. *Crouse*, 214 Ark. 830, 218 S. W. 2d 375.

The cases hereinbefore cited also constitute authority for the proposition that a prescriptive easement may be barred after maintenance of a gate for more than seven years, without any action by one claiming the easement to prevent the obstruction, and that failure to take such action during that period constitutes an abandonment of the easement. Our most recent application of these rules was in *Munn* v. *Rateliff*, (November 10, 1969), 446 S. W. 2d 664.

The real point at issue on this appeal is the intention of appellees in placing and maintaining the gates, or at least the gate at the entrance to their property from the county road. In *Raney* v. *Gunn*, 221 Ark. 10, 253 S. W. 2d 559, where it had been alleged that there had been an abandonment of permissive and prescriptive rights after the erection and maintenance of gates for the purpose of preventing entry of livestock into a pasture, we held that a landowner seeking injunctive relief against the closing of the gate had the burden of proving that a prescriptive right still existed.

While we agree with the chancellor that the question is a close one, we cannot say that his finding was clearly against the preponderance of the evidence.

Thomas Hoover testified that it had been necessary to open a wire gap to go in and out of the Smith place ever since he could remember and that no one had to ask permission. Those using the gate opened and closed it as they entered the Smith place. Hoover also testified that on the other side of the Smith place he always opened another gate on his own land. Both

gates had been in place as long as he could remember. He testified that the latter gate was actually on appellants' land. According to him, the property line was on the west side of a slough and the fence between the lands of the parties on the east side of the slough. Hoover claimed the fence on the east side and the gate there, but admitted that the fence and gate on the west side of appellees' property belonged to Smith. The reason for this location of the fence was explained by Glenn Baker, the son of appellants' predecessor in title and a witness called by appellants. He said that his father built the fence on the east side of the slough to leave a little road going down through the slough, so people could get to a big bend in the slough without bothering the fence. He stated that most of the slough was on Smith's land.

Hoover related that he had placed a culvert in the road in 1965 and was assisted by Smith and appellees' son. He also stated that he had the county put gravel on about 50 yards of the road from a trestle down to the slough bridge. All this was done, he said, with the knowledge and approval of Smith. Mack Rogers, who helped Hoover with this work, confirmed the presence of Smith when the culvert was installed. Rogers had heard Smith threaten to "cut up the road" on an occasion when Smith · showed him where travel had taken place across his meadow, making it sort of muddy and "bogged down."

Smith testified that he had erected a "posted" sign near the entrance gate in 1960. At about the same time he also placed an "article" from a farm magazine on a post at the gate. It recited "Read before you enter" and "This is a privilege to enter this, not a right to this property." Smith stated that he also wrote the words "Read before you enter" on a piece of cardboard which he placed above the piece of magazine paper.

When it was established on cross-examination

that Smith did run cattle on his land at times, the following ensued:

"Q. These gates you put up there—these gaps we've been talking about, were they placed there to stop the traveling public or to keep your cows in?

A. To keep my cows in and keep the outside cattle out.

Q. It was never your intent until lately, until folks started driving over your meadow for you to keep the public out or Mr. Hoover out, is that correct?

A. Well, I tell you, there has been for years that I've threaten to lock it but never did get around to it and I should have done it twenty years ago.

Q. And I take it you have threaten to do it from time to time?

A. In my own mind."

Mrs. Smith corroborated her husband's testimony as to the magazine clipping posted on the gate. She also stated that her son had brought materials from college 19 years ago, and stencilled "posted" signs to put up. She recalled that the gates had been locked for short periods of time during several years prior to November, 1968.

Hoover could recall having seen a sign on a board near a spring along the road saying "Keep out." He testified that he made inquiry of Smith, and that Smith replied that the sign was only intended to apply to people who were running around over the pasture, but not to Hoover.

The question whether the gates were maintained

for reasons other than restraint of cattle so that they constituted notice to Hoover and the public was a question of fact to be determined by the chancellor. *Brock* v. *Bates,* 227 Ark. 173, 297 S. W. 2d 938. When the evidence is conflicting or evenly poised, or nearly so, in cases such as this, the judgment of the judge who had the opportunity to see and hear the witnesses in evaluating the evidence is persuasive. *Munn* v. *Rateliff,* (November 10, 1969), 446 S. W. 2d 664. Viewing the testimony relating to the placing of signs on the gate by Smith, we are unable to say that the chancellor's finding on the critical point was against the preponderance of the evidence. The chancellor's finding is particularly persuasive in this instance, because he gave deliberate and extensive consideration to a motion for rehearing questioning his original holding on this point.

Appellants argue that our opinion in the *Munn* case suggests that a private easement might exist under circumstances which might result in a holding that a public easement had been abandoned, if the way in question is a landowner's only means of ingress and egress. Yet, we did not have such a case before us there. We definitely stated that the owner there had another means of access. Although we referred to the abandonment of a public way, it is clear that appellant there was relying only upon a public easement, and it is doubtful that the facts would have permitted a claim of private easement. In any event, we have applied the same rules in cases where individual rights, as well as rights of the public, were asserted or apparent. *Brooks* v. *Reedy,* 241 Ark. 271, 407 S. W. 2d 378; *Lusby* v. *Herndon,* 235 Ark. 509, 361 S. W. 2d 21; *Brock* v. *Bates,* 227 Ark. 173, 297 S. W. 2d 938; *Mount* v. *Dillon,* 200 Ark. 153, 138 S. W. 2d 59.

The chancellor correctly held that the fact that there may be no other means of ingress and egress to appellants' lands would not permit their continued use of the road as a way of necessity. There is a lack of essential ingredients to allowance of such a way: the

Smiths are strangers to appellants' title; and, although it appears from the evidence that there has been another means of access, there is no showing that a necessity existed when appellants purchased their land. *Boullion v. Constantine,* 186 Ark. 625, 54 S. W. 2d 986; *Craig* v. *O'Bryan,* 227 Ark. 681, 301 S. W. 2d 18.

The chancellor retained jurisdiction to allow appellants time to proceed under Ark. Stat. Ann. § 76-111 (Repl. 1957) et seq. Under authority of *Harper* v. *Hannibal,* 241 Ark. 508, 408 S. W. 2d 591, we reinvest the chancellor with jurisdiction to allow appellants to continue to use the roadway until they have been afforded a reasonable time to so proceed after this decision has become final.