294 So.2d 73 (1974)
The CITY OF DAYTONA BEACH, a Municipal Corporation Organized and Existing under the Laws of the State of Florida, et al., Petitioners,
v.
TONA-RAMA, INC., a Florida Corporation, et al., Respondents.
No. 43352.
Supreme Court of Florida.
March 25, 1974.
Rehearing Denied May 30, 1974.
*74 Isham W. Adams, Daytona Beach, and J. Lewis Hall, Tallahassee, for petitioners.
Robert L. Shevin, Atty. Gen., Barry Scott Richard, Deputy Atty. Gen., and Anthony J. Grezik, of Grezik & Johnson, Daytona Beach, for respondents.
ADKINS, Chief Justice.
This cause is here on petition for writ of certiorari supported by certificate of the District Court of Appeal, First District, that its decision in City of Daytona Beach v. Tona-Rama, Inc., 271 So.2d 765, is one which involves a question of great public interest. We have jurisdiction. Fla. Const., art. V, § 3(b) (3), F.S.A., F.A.R. 4.6, 32 F.S.A.
For clarity, the parties will be referred to as they appeared in the trial court. Respondents, Tona-Rama, Inc., et al., were plaintiffs, and petitioners, McMillan and Wright, Inc., et al., were defendants. Toma-Rama, Inc. will be referred to as plaintiff and McMillan and Wright, Inc. as defendant.
Defendant has owned water front property in Daytona Beach, Florida, for more than 65 years and operated on the property an ocean pier extending 1,050 feet over the Atlantic Ocean as a recreation center and tourist attraction. Defendant provided such attractions as fishing space, helicopter flights, dances and skylift.
The tract of land upon which the pier begins extends 102 feet north and south along the ocean front and approximately 1,050 feet landward of the mean high water mark. This area of approximately 15,300 square feet is an area of dry sand and is covered by water only on rare occasions during extremely high tide and during hurricanes. Defendant secured a permit for and constructed the observation tower which precipitated this litigation. The circular foundation of the tower is 17 feet in diameter and the diameter of the tower is four feet. It occupies an area of approximately 225-230 square feet of the 15,300 square feet of land to which defendant holds record title. The observation tower is an integral part of the pier and can only be entered from the pier.
Oceanward and easterly of the dry sand area is the foreshore, that is, the area between the high and low water marks and is designated herein as the hard or wet sand area.
Building permit was issued by the City for construction of the tower after public hearings. After the permit was issued, the tower was constructed at a cost of over $125,000.
Plaintiff operated an observation tower near the site of the pier of defendant and protested the issuance of the permit. When work in connection with the erection of the tower had progressed to completion of test borings and other arrangements, plaintiff commenced this action against defendant for a declaratory judgment and injunctive relief to prevent the erection of defendant's public observation tower. Among other contentions, plaintiff alleged that by continuous use of the property for more than 20 years, the public had acquired an exclusive prescriptive right to the use of the land of defendant. The application of plaintiff for a temporary injunction was denied and the tower was completed. Thereafter, the parties moved for summary judgment and at the hearing thereon testimony taken on application for *75 temporary injunction, stipulated facts, and affidavits were submitted. The trial court entered a summary judgment in favor of plaintiff and directed the defendant to remove the observation tower within 90 days. Upon appeal, the judgment of the trial court was affirmed and the case certified to us as being one which passes on a question of great public interest.
The facts presented before the trial court were not sufficient to support a summary judgment which, in effect, deprived a land owner of meaningful use of a large portion of the land for which he paid, which he presently occupies in part, and on which he pays taxes.
The land in question is a parcel of white, powdery sand running between the hard-packed driving surface of Daytona Beach and the existing seawalls. By stipulation of the parties, the land is above the normal high water mark and would be subject to being covered by the waters of the Atlantic Ocean only during hurricanes or extremely high tides.
We recognize the propriety of protecting the public interest in, and right to utilization of, the beaches and oceans of the State of Florida. No part of Florida is more exclusively hers, nor more properly utilized by her people than her beaches. And the right of the public of access to, and enjoyment of, Florida's oceans and beaches has long been recognized by this Court.
White v Hughes, 139 Fla. 54, 190 So. 446 (1939), was a suit brought to recover damages from injuries received by plaintiff White when struck by an automobile driven by defendant on the beach of the Atlantic Ocean between high and low water marks, the hard or wet sand area. The Florida Statute had declared the hard sand area to be a public highway. The trial court instructed the jury that the public in using the beach for the purpose of bathing and recreation had "rights at least equal" to the rights of motorists on that part of the beach. This instruction was held to be error, the Court saying:
"There is probably no custom more universal, more natural or more ancient, on the sea-coasts, not only of the United States, but of the world, than that of bathing in the salt waters of the ocean and the enjoyment of the wholesome recreation incident thereto. The lure of the ocean is universal; to battle with its refreshing breakers a delight. Many are they who have felt the lifegiving touch of its healing waters and its clear dustfree air. Appearing constantly to change, it remains ever essentially the same.
......
"The Sovereign state may in the interest of the general welfare authorize the beach or shore to be appropriately used as a public highway. And most of our Florida beaches, when the tide is out, afford marvelously perfect highways, which are obliterated and re-built twice each day by the unseen hand of the Almighty. However, we are of the opinion that such an authorization for highway uses must be subject to reasonable use of the beach or shore for its primary and long established public purposes, for which the State holds it in trust, and subject to lawful governmental regulations.
"For the above reasons we hold that the right of the public to use the beach for bathing and recreational purposes is superior to that of the motorists driving automobiles thereon." 190 So. 446, pp. 448-450.
It is possible for the public to acquire an easement in the beaches of the State by the finding of a prescriptive right to the beach land. City of Miami Beach v. Undercliff Realty & Investment Co., 155 Fla. 805, 21 So.2d 783 (1945), and City of Miami Beach v. Miami Beach Improvement Co., 153 Fla. 107, 14 So.2d 172 (1943). However, in both of the cases cited *76 above and relied upon by the District Court of Appeal, First District, in the case sub judice, this Court declined to find such prescriptive right in the public because of the absence of an adverse nature in the public's use of private beach land.
This Court in City of Miami Beach v. Undercliff Realty & Investment Co., supra, said:
"It is true that in the earlier days preceding the remarkable development of Miami Beach, when it had a small population, many persons used the beach for bathing, sunning and other recreational purposes. The fact that the upland owners did not prevent or object to such use is not sufficient to show that the use was adverse or under a claim of right. It has not been shown that there has been an open, notorious, continuous and uninterrupted use of the beach by the public, in derogation of the upland proprietors' rights, for a period of twenty years, or for any period." 21 So.2d 783, p. 786.
This Court in Downing v. Bird, 100 So.2d 57 (Fla. 1958), set forth the test for right of access by prescription:
"In either prescription or adverse possession, the right is acquired only by actual, continuous, uninterrupted use by the claimant of the lands of another, for a prescribed period. In addition the use must be adverse under claim of right and must either be with the knowledge of the owner or so open, notorious, and visible that knowledge of the use by and adverse claim of the claimant is imputed to the owner. In both rights the use or possession must be inconsistent with the owner's use and enjoyment of his lands and must not be a permissive use, for the use must be such that the owner has a right to a legal action to stop it, such as an action for trespass or ejectment.
"Further in either prescription or adverse possession, the use or possession is presumed to be in subordination to the title of the true owner, and with his permission and the burden is on the claimant to prove that the use or possession is adverse." (Emphasis supplied.) (p. 64)
If the use of an alleged easement is not exclusive and not inconsistent with the rights of the owner of the land to its use and enjoyment, it would be presumed that such use is permissive rather than adverse. Hence, such use will never ripen into easement. This principle was recognized in J.C. Vereen & Sons v. Houser, 123 Fla. 641, 167 So. 45 (1936), where this Court quoted with approval from Jesse French Piano & Organ Co. v. Forbes, 129 Ala. 471, 29 So. 683, 685, 87 Am.St.Rep. 71, as follows:
"No easement can be acquired when the use is by express or implied permission... . The user or enjoyment of the right claimed, in order to become an easement by prescription, must have been adverse to the owner of the estate over which the easement is claimed, under a claim of right, exclusive, continuous, and uninterrupted, and with the knowledge and acquiescence of the same... . One circumstance always considered is whether the user is against the interest of the party suffering it, or injurious to him. There must be an invasion of the party's right, for, unless one loses something, the other gains nothing." (Emphasis supplied.) (167 So. p. 47.)
In the case sub judice, the land in issue is occupied in part by the Main Street pier, a landmark of the Daytona Beach oceanfront for many years, and the land and pier are owned by the defendant. The pier is used as a recreation center and tourist attraction. It is utilized for fishing and dances, and offers a skylift and helicopter flights by the present owner.
That portion of the land owned by defendant which is not occupied by the pier has been left free of obstruction and has been utilized by sunbathing tourists for untold decades. These visitors to Daytona Beach, including those who have relaxed on the white sands of the subject lands, are *77 the lifeblood of the pier. As such, they have not been opposed, but have been welcomed to utilize the otherwise unused sands of petitioner's oceanfront parcel of land.
The sky tower, which was substantially completed when the trial judge's order halted it, consists of a metal tower rising 176 feet above the ocean and a 25-passenger, air-conditioned gondola which was to be boarded from the pier to rise, rotating slowly, to the top of the tower, remain rotating at the top for a few minutes, and then descend. The tower utilizes a circle of sand only 17 feet in diameter. A building permit was issued in October, 1969, and the project was completed, representing an investment of over $125,000, by the time the hearings were held.
The trial judge held that the land upon which the tower was constructed was
"[A] public thoroughfare, public bathing beach, recreation area and playground."
Upon this finding, the trial judge declared that the lands had been rendered public by prescriptive right. The District Court of Appeal, First District, affirmed, thus approving the destruction of the $125,000 investment and dooming any meaningful use of the property by the owner. In effect, the owner of the land is paying taxes for the sole benefit of the public.
As noted above, such prescriptive right has been recognized by this Court, and under proper circumstances is just. However, such a situation is not presented in the case sub judice.
The District Court of Appeal, First District, opined:
"It is our view that the sporadic exercise of authority and dominion by the owners over the parcel in question was not sufficient to preserve their rights as against the prescriptive rights which accrued to the benefit of the public by its use of the beach area." City of Daytona Beach v. Tona-Rama, Inc., 271 So.2d 765, p. 767.
The District Court also holds that the test of Downing v. Bird, supra, has been met. We cannot agree. The public has continuously, and over a period of several decades, made uninterrupted use of the lands in issue. However, neither the trial court, nor the District Court, reached the other requirement for prescription to be properly effective  adverse possession inconsistent with the owner's use and enjoyment of the land.
The use of the property by the public was not against, but was in furtherance of, the interest of the defendant owner. Such use was not injurious to the owner and there was no invasion of the owner's right to the property. Unless the owner loses something, the public could obtain no easement by prescription. J.C. Vereen & Sons v. Houser, supra.
Even if it should be found that such an easement had been acquired by prescription, the defendant-owner could make any use of the land consistent with, or not calculated to interfere with, the exercise of the easement by the public. See Tiffany Real Property, (Third Edition), Vol. 3, Section 811. The erection of the sky tower was consistent with the recreational use of the land by the public and could not interfere with the exercise of any easement the public may have acquired by prescription, if such were the case.
The beaches of Florida are of such a character as to use and potential development as to require separate consideration from other lands with respect to the elements and consequences of title. The sandy portion of the beaches are of no use for farming, grazing, timber production, or residency  the traditional uses of land  but has served as a thoroughfare and haven for fishermen and bathers, as well as a place of recreation for the public. The interest and rights of the public to the full use of the beaches should be protected. *78 Two states, Oregon and Hawaii, have used the "customary rights doctrine" to afford the rights in beach property. State ex rel. Thornton v. Hay, 254 Or. 584, 462 P.2d 671 (1969); In re: Ashford, 50 Haw. 314, 440 P.2d 76 (1968). See also Fla. Law Review, Easements: Judicial and Legislative Protection of the Public's Rights in Florida's Beaches by W. Roderick Bowdoin, Vol. XXV, No. 3, pp. 586-590 (Spring 1973).
As stated in Tiffany Real Property, (Third Edition), Vol. 3, § 935:
"In England, persons of a certain locality or of a certain class may have, by immemorial custom, a right to make use of land belonging to an individual. Thus, there may be a custom for the inhabitants of a certain town to dance or play games on a particular piece of land belonging to an individual, or to go thereon in order to get water. So there may be a custom for fishermen to dry nets on certain land, or for persons in a certain trade (victualers) to erect booths upon certain private land during a fair. The custom, to be valid, `must have continued from time immemorial, without interruption, and as of right; it must be certain as to the place, and as to the persons; and it must be certain and reasonable as to the subject matter or rights created.'
...
"Occasionally in this country it has been decided that rights to use private land cannot thus be created by custom, for the reason that they would tend so to burden land as to interfere with its improvement and alienation, and also because there can be no usage in this country of an immemorial character. In one state, on the other hand, the existence of such customary rights is affirmed, and in others this is assumed in decisions adverse to the existence of the right in the particular case." (pp. 623-624)
If the recreational use of the sandy area adjacent to mean high tide has been ancient, reasonable, without interruption and free from dispute, such use, as a matter of custom, should not be interfered with by the owner. However, the owner may make any use of his property which is consistent with such public use and not calculated to interfere with the exercise of the right of the public to enjoy the dry sand area as a recreational adjunct of the wet sand or foreshore area.
This right of customary use of the dry sand area of the beaches by the public does not create any interest in the land itself. Although this right of use cannot be revoked by the land owner, it is subject to appropriate governmental regulation and may be abandoned by the public. The rights of the owner of the dry sand area may be compared to rights of a partowner of a land-locked nonnavigable lake, as described in Duval v. Thomas, 114 So.2d 791 (Fla. 1959).
Testimony was presented that the public's presence on the land and its use of the land was not adverse to the interest of defendant, but rather that the defendant's Main Street pier relied on the presence of such seekers of the sea for its business. Thus, the issue of adversity was clearly raised and the evidence failed to show any adverse use by the public. In fact, the construction of the sea tower was consistent with the general recreational use by the public. The general public may continue to use the dry sand area for their usual recreational activities, not because the public has any interest in the land itself, but because of a right gained through custom to use this particular area of the beach as they have without dispute and without interruption for many years.
The decision of the District Court of Appeal is quashed and this cause is remanded to the District Court with instructions to further remand the same to the trial court for the purpose of entering final judgment for defendant.
It is so ordered.
*79 McCAIN, DEKLE and CARLTON (Retired), JJ., concur.
ERVIN, J., dissents with opinion.
BOYD, J., dissents with opinion.
MAGER, District Court Judge, concurs in part and dissents in part with opinion.
BOYD, Justice (dissenting).
I respectfully dissent.
Historians estimate that the North American continent has been inhabited by man for at least ten thousand years, and that, at the time Columbus discovered America, twenty-five thousand Indians lived in Florida.[1]
One does not have to be a Chamber of Commerce publicity director to assume that these earliest of Floridians enjoyed the beautiful sandy beaches at Daytona. They were followed by countless Europeans, and, for many decades, the City of Daytona Beach has exercised dominion over the beaches, as if the beaches were owned and controlled by the City government. Thus, the case before us obviously presents a unique situation in which the land has been treated by the public and local government for many decades as publicly owned land. The public has used it for swimming, hiking, auto driving, and related purposes for a period much longer than twenty years, without interruption. The City has furnished police, sanitation, life guard, and other municipal services, normally provided to City-owned beach property, during said time. With the exceptions of being registered in the public records as privately owned, and the payment of taxes, the property has had all the attributes of a publicly owned beach continuously for more than twenty years. Surely, when the present owner purchased the land in question, it was common knowledge that the public had, for centuries, used both the wet and dry sand near the ocean for recreational purposes.
The majority view holds that prescriptive rights for the public could occur only by uses adverse to the owner. However, as many courts have noted:
"The ultimate burden of proving a prescriptive right rests on the claimant or one who is to be benefited by its establishment, and he must clearly show that all the elements necessary to constitute a valid claim to such a right are present. There is a conflict of authority, however, as to whether the use of a claimed easement by prescription raises a presumption of permissive use or a presumption of adverse user. It is held in some cases that where a claimant has shown an open, visible, continuous, and unmolested use of land for the period of time sufficient to acquire an easement by adverse user, the user will be presumed to be adverse and under a claim of right, so as to place upon the owner of the servient estate, in order to avoid the acquisition of an easement by prescription, the burden of rebutting this presumption by showing that the use was permissive."[2]
If this building be permitted to stand, then the owner might well next decide to erect a gargantuan hotel on the property, and the adjoining property owners, demanding equal protection of the law, might then begin to construct a series of hotels along the waterfront  similar to the series that now exists along the East side of Collins Avenue in Miami Beach. This would form a concrete wall, effectively cutting off any view of the Atlantic Ocean from *80 the public. A repetition of the concrete wall created by such buildings would be extremely detrimental to the people of this State and to our vital tourism industry.
In my opinion, the trial court and the District Court of Appeal, First District, were correct in ordering the structure removed, for the reason that it encroaches upon the prescriptive rights of the public.
The record shows that the building was constructed, with a building permit granted by the City of Daytona Beach, apparently in good faith by the owner of record, who has been paying taxes on the property, and whose equitable rights should not be completely ignored. The trial court should require an accounting of all costs expended and all income received from this recreational structure, and if the money received thus far from the investment has not reimbursed all of those who have invested in the facility in good faith, they should be allowed to recoup their investments before removal of the structure. The equitable principles involved in the elimination of a non-conforming use would apply here.
The majority opinion ably defines the law generally applicable to beach properties. The intermittant, occasional use of dry sand beach property by individuals or groups for recreational purposes does not establish prescriptive easements. If such were the law of this state, countless thousands of beach lots would have questionable titles. I dissent to the majority opinion only because the property here in question is totally unique in character by its treatment and use as a public beach for many decades. Only property having the same unique characteristics should be affected by any decision against this owner.
I offer no comment or opinion as to how far back from the wet sand the owner should be denied building privileges, but I don't think the government can collect taxes while denying the owner some reasonable use of the property not in conflict with the prescriptive rights of the public.
Therefore, I respectfully dissent to the majority opinion, and would affirm the decision of the District Court of Appeal, First District.
ERVIN, Justice (dissenting).
I concur with much of the reasoning and the conclusions of Justice Boyd reflected in his excellent dissent.
It is clear to me that the majority has no sound basis in law to substitute its judgment on the instant facts for the prescriptive easement findings of the trial judge affirmed by the District Court. The cases are legion that factual findings upon issues such as are presented in this case, i.e., primarily whether a public easement had accrued should not be appellately disturbed. See 5 A.C.J.S. Appeal and Error § 1669, pp. 635-641 incl.; Holding v. Holding (Fla.) 46 So.2d 893; Carolina Lumber Co. v. Daniel (Fla.App.) 97 So.2d 156.
The decision of the District Court upholds a factual determination of the Circuit Court that the existence of the observation tower constructed by petitioners McMillan and Wright, Inc., denied the public the full use of the beach area involved in this litigation as a thoroughfare, bathing beach, and playground  which had been used as such by the public "openly, notoriously, continuously and uninterrputed" for over twenty years.
On appeal the District Court ruled:
"It is our view that the sporadic exercise of authority and dominion by the owners over the parcel in question was not sufficient to preserve their rights as against the prescriptive rights which accrued to the benefit of the public by its use of the beach area.
* * * * * *
"Based upon the foregoing authorities, [City of Miami Beach v. Miami Beach Improvement Co., 153 Fla. 107, 14 So.2d 172 (1943); City of Miami Beach v. Undercliff Realty & Investment Co., 155 Fla. 805, 21 So.2d 783 (1945); *81 Downing v. Bird, 100 So.2d 57 (Fla. 1958)] we conclude that the trial court applied correct principles of law to the facts found by it in holding that the public has acquired ... use and enjoyment of the soft sand area..."
Upon petition for rehearing, the District Court filed a follow-up opinion which indicated that its decision was not based upon public policy notions concerning access to beaches and coastal areas, but that it was based on the ancient doctrine of prescriptive easement.
While I think that under the particular facts of this case the finding below of a prescriptive easement in favor of the public to the instant beach area should be affirmed, I believe a broader view of the law is applicable which if pronounced by this Court would afford more realistic protection of the public's rights not only in the subject beach area but to hundreds of miles of Florida beaches which have been used by Florida inhabitants from time immemorial.
I think the law of custom applies. This concept is explicated in the University of Florida Law Review, Volume XXV, Spring 1973 Number 3, pages 590 to 592, incl. See State ex rel. Thornton v. Hay, 254 Or. 584, 462 P.2d 671 (1969).
What is overlooked by the majority is that as to prescriptive public coastal areas, navigable waters, tide lands and sovereignty lands, the judiciary has a positive and solemn duty as a last resort to protect the public's rights to the enjoyment and use of any of such lands. There is ample precedent of this Court to afford this protection, including those relating to the inalienable trust doctrine in sovereignty lands and navigable areas. Cf. State ex rel. Ellis v. Gerbing (1908), 56 Fla. 603, 47 So. 353, and Hayes v. Bowman (Fla. 1957), 91 So.2d 795.
In this case the majority refuses to accede to a positive finding of the Courts below that the public prescriptively owned and enjoyed the famed Daytona Beach frontage sand area (even to the extent of using it for a race course) for years far exceeding the period necessary for the exclusion of any private interest therein. The finding below is a matter of common knowledge to anyone familiar with the history and use of the Atlantic Ocean coastal area opposite the City of Daytona Beach.
This precedent of the Court majority is a regrettable and unfortunate one which will serve to render more uncertain the rights of the general public to enjoy Florida's prescriptive public beach areas which historically they have so long enjoyed. It will encourage, as Justice Boyd so ably points out, further private, commercial intrusions and obstructions upon public domain areas which have been used as such since time immemorial.
The majority decision is of the same genre as the holdings in Daniell v. Sherrill (Fla. 1950), 48 So.2d 736; Trustees of Internal Improvement Fund v. Lobean (Fla. 1961), 127 So.2d 98; Zabel v. Pinellas County Water and Navigation Control Authority (Fla. 1965), 171 So.2d 376, and Trustees of Internal Improvement Fund v. Wetstone (Fla. 1969), 222 So.2d 10, and similarly declines to protect the paramount interests of the public in public land areas, but in this case the decision rests upon even less tenable grounds. With Florida's population burgeoning and its recreational needs multiplying by leaps and bounds, the State's courts can ill afford any longer to be profligate with its public areas and allow them to be frittered away upon outmoded pretexts for commercial exploitation.
MAGER, Associate Justice, (dissenting, in part; concurring, in part):
I find myself in the somewhat unusual position of disagreeing with the reasoning and conclusions of the majority insofar as it fails to recognize the establishment of the prescriptive rights of the public to the beach areas in question; but, at the same *82 time, agreeing with the result reached by the majority insofar as it would not direct the removal of the observation tower built during the pendency of litigation. I therefore must concur with the reasoning and conclusions of Justices Ervin and Boyd to the extent that there has accrued in favor of the public a prescriptive easement to the beach area in dispute. I cannot, however, subscribe to the minority views that the observation tower must be torn down.
In my view, the application of the well established principles of law relating to public prescriptive easements must be made to depend upon the peculiar facts and circumstances of each case. A tailor-made application of these principles is more poignantly evident in declaratory proceedings where mandatory injunctive relief is sought.
In an equitable proceeding, where the court strives to do equity amidst an atmosphere encompassing the preservation of public beach areas, on the one hand, and a recognition of the private ownership of property, on the other hand, the courts must and should endeavor to balance the equities of the parties. In Loeffler v. Roe, 69 So.2d 331 (Fla. 1954), this Court pointed out that it is a fundamental principle of equity that courts will not require the performance of an act where the harm to the person coerced is wholly disproportionate to the benefit of the other party. The doctrine of "comparative injury" or "balance of conveniences" is set forth in 17 Fla.Jur. Injunctions, Sec. 24, as follows:
"Situations may exist that require application of the principle of balancing the relative conveniences of the parties, the rule being that equity will not require by injunction the performance of an act where the harm to the person coerced is wholly disproportionate to the benefit of the other party, or, indeed, when greater injury and inconvenience will result to the defendant from an injunction than will be caused to the plaintiff by its refusal."
See also 40 A.L.R.3d 601.
An application of this concept is appropriate under the facts and circumstances of the case sub judice. The observation tower, which was built in good faith by the owner of record on what he perceived to be his "own land", occupies "an area of approximately 225 to 230 square feet" of the 15,300 square feet in dispute. It would seem to me that the observation tower can remain intact without abrogating the public's prescriptive easement in the 15,000 some odd square feet of otherwise unencumbered beachfront.
Under these circumstances public and private use can operate in tandem. The public interest is thus fully preserved without completely obliterating the vestiges of private ownership.
NOTES
[1] See C.W. Tebeau, A History of Florida (1971).
[2] 25 Am.Jur.2d Easements and Licenses § 119 (1966). (Footnotes omitted.) (Emphasis supplied.) For the sake of brevity, the reader is referred to the cited section, and its respective 1973 Annual Cumulative Supplement, where over twenty-five cases, in support of the emphasized portion of the foregoing quote, are noted.