### WYMBS, et al v. ARVIDA CORPORATION.
No. 76-3345 CA (L) 01-A.
Circuit Court, Palm Beach County.
July 17, 1978.

Barry Scott Richard of Roberts, Miller, Baggett, Laface, Richard & Wiser, Tallahassee, for the plaintiffs.

William J. Dunaj of Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, for the defendant.

TIMOTHY P. POULTON, Circuit Judge.

*Findings of fact, conclusions of law, and final judgment:* This matter having been fully tried before the court, and subsequent to trial the court, upon notice, having held hearings and considered each proposed finding of fact and conclusion of law, and having heard argument from the parties and having considered all portions of the evidence and citations of law related to each finding and conclusion, the court finds as follows —

The property that is the subject matter of this suit, known as Sabal Point, is located in Boca Raton, Palm Beach County, Florida, immediately to the north of the Boca Raton Inlet between the Atlantic Ocean to the east and Lake Boca Raton to the west.

The property is unimproved beachfront property that has been privately owned for many years, and of the more significant recent owners, the Schine family owned the property until 1956, at which time it was conveyed to Arvida Realty Co. which subsequently conveyed it to Arvida Corporation in 1964.

Arvida Corporation, the defendant herein, is the owner of the subject property under a warranty deed which was duly recorded in Palm Beach County, and it has paid the taxes on the property from the date of its ownership.

The plaintiffs are a class of persons who have used and who claim rights to continue to use footpaths across the subject property and the dry sand beach on the subject property. The representative plaintiffs that instituted this suit are members of that class who have adequately represented the interests of the other persons in the class.

While the plaintiffs claimed four specific footpaths described by them in the several complaints, and while some testimony was

presented that indicated that other clearings were occasionally used to walk across the property, plaintiffs' counsel expressly waived and abandoned all claims to paths across the property, other than the two clearings shown on plaintiffs' Exhibit 2 as located between the numbers placed thereon as 1-2-2 and 3-3, at the close of the plaintiffs' case. No evidence supports any claim that other footpaths were present on the property for a sufficiently continuous period of time that they may be subject to claims of public rights, aerial photographs placed in evidence showed that no other clearings were present for the continuous period required to support such claims, and the plaintiffs' motion to conform their pleadings to the evidence was granted at the close of the trial without objection. Thus, only two claims as to footpaths remain for consideration — claimed paths 1-2-2 and 3-3 as they will be referred to hereinafter referring to the numbers placed on plaintiffs' Exhibit 2 as establishing their respective points of beginning and termination.

Further, plaintiffs abandoned all further claims to path 3-3 in their post-trial memorandum wherein they stated "It is not necessary for the court to decide the issue with regard to path number three" and "It is not necessary for us to pursue the issue of path number three."

The plaintiffs in their complaint claimed rights to the entire dry sand portion of the beach on the subject property. However, no testimony of any frequency or regularity of use was presented as to any portion of the dry sand beach on the subject property except that portion between the jetty to the south, and the first red line to the north of the jetty placed upon plaintiffs' Exhibit 2 by witnesses during their testimony. The plaintiffs moved to conform their pleadings to the proof, and the motion was granted without objection. Thus, there are no remaining claims for the court to consider as to portions of the dry sand beach other than that described hereinabove, and that portion will be described hereinafter as the "claimed beach."

One witness, Mrs. Benedetto, testified that she and some other persons used the beach on the property immediately to the north of the Boca Raton Inlet in the early 1920's. However, as the Boca Raton Inlet prior to 1928 had been approximately one-half mile south of the subject property and was not relocated to its present location until after that date, it is unclear whether this testimony related to the subject property or other property to the south. However, the testimony was further to the effect that during the early 1920's there were very few persons living in the area, and they used all of the beaches which were open and unimproved at the time.

In the late 1920's and the 1930's a wooden building was located on the subject property near its southeastern edge at the approximate location marked on plaintiffs' Exhibit 2 by Sgt. Gallogly. The building was near the end of the old wooden bridge which also existed on the property near the curve in the waterway where Lake Boca Raton turns into the inlet. The wooden building was variously called the Griffin Place or the "Old Casino," and a family who lived there operated a business from it including a gasoline station, the sale of bait, tackle and soda and a dance hall inside the building. They displayed signs on the building which included the words "Fishing" and "Swimming." Persons who were attracted to the property bought gasoline, bait, tackle and soda from the persons who operated the business on the property. No evidence was presented as to whether the business was operated by or with the permission of the owner of the property at the time, and the Florida rule presuming such use to be with the permission of the owner must be applied.

The clearing which remained after the demolition of the "Old Casino" as well as the parking area that surrounded that building, are included within the path claimed by the plaintiffs as 1-2-2.

In 1930 the present inlet was dredged and the jetty was built by Arvida's predecessor in title. Prior to 1930 an inlet had existed approximately one-half mile south of the present location.

In 1939 land was dedicated by conveyances to the State Road Department from the owner of Sabal Point at that time to create Old State Road A1A which was paved and thereafter until 1963 ran north and south along the length of Sabal Point and across the wooden bridge.

In 1953 large piles of sand and other material dredged from the inlet were located on the subject property at the approximate location marked on plaintiffs' Exhibit 2 with a circle near the edge of the inlet. The sand piles drifted over the edge into the inlet requiring anyone to walk around them on the side away from the inlet. These sand piles were approximately 35 feet high and remained on the property for several years.

From the early 1950's until 1956, several small businesses were operated on the subject property which was owned at the time by Mr. Schine. Captain Andy Brennan worked for Mr. Schine and operated a charter boat on the property with his permission. Charles Getchel operated a bait and tackle shop and refreshment stand on the property 250 feet from the northwest terminus of path 1-2-2 from 1950 to 1956. Mr. Schine said he had to charge Mr. Getchel something for using the property as a matter of "business." Consequently, Mr. Getchel paid Mr. Schine $10 a month for use of the property, although Mr. Schine forgave him

from paying the rent for the last year he leased the property. During this period, Mr. Schine visited the property twice daily, and he never voiced any objection to other people using the property.

In 1963 the old wooden bridge at the southern end of Sabal Point was demolished and replaced by a new bridge which crossed the inlet at the northern end of the subject property. At the same time, State Road A1A was rerouted over the new bridge, and the Old State Road A1A which had traversed the subject property was abandoned by a deed conveying the state's former right-of-way to Arvida Corporation. In exchange for that deed of the former right-of-way, Arvida Corporation conveyed land to the state needed for and used in the construction of the new bridge and the rerouting of the highway.

Prior to 1963, persons who used the subject property parked their cars along Old State Road A1A in the general area of the curve near the wooden bridge and proceeded by foot from that point.

After the relocation of the bridge and the conveyance of the right-of-way of the former State Road A1A to Arvida, a six-foot high chain link fence was constructed by Arvida in 1965 along the northern and western boundaries of the Sabal Point property and no trespassing signs were posted along the fence.

After 1965 some use of the property could have been adverse to the owner, as the general permissive attitude toward use of the property was revoked by the placement of the fence and the signs. However twenty years has not expired since the placement of the fence and the signs.

After the road and bridge were relocated and the fences were constructed along the property line, a number of persons who had used the property stopped using it entirely — a number of these persons did so because of the placement of the fence and the no trespassing signs. Some people continued to use the property.

Those persons who continued using the property after the placement of the fences stopped driving their vehicles down the paved section of former State Road A1A. Instead, they parked their vehicles outside the fence along new State Road A1A or in the general location of the new bridge. From this area those who continued using the property walked to the fence and circumvented it by jumping over, wading around the end at Lake Boca Raton, at times going through the gates if they were left open, and at other times by breaking down or cutting the fence or by walking over portions of the fence broken down by others. Once the fence had been circumvented, they either walked many different routes to get to the location of claimed path 1-2-2 or stopped using that path and crossed to the beach using different routes.

Several witnesses testified that they stopped going to the property because of the fence, one of them stating "the fence gave me the message" [Enid Brennan; see also Bill Eubanks and Robert Sloan.]

After the fences were erected, for a period of almost a year from 1966 to 1967, guards were employed by Arvida to keep trespassers off the Sabal Point property. These guards patrolled the property and the fence line, and were effective in keeping persons off the property during this period unless they were given permission by Arvida to use the property.

During this period, from 1965 to 1968, path 1-2-2 became overgrown with vegetation due to lack of use. Subsequent to 1968 it was reopened as a vehicle road, which was subsequently improved as a "shell rock road" during construction and dredging work on the jetty and at the southern end of the property. All of the construction on the property including the construction of the road was either done by Arvida or under license granted by Arvida.

Because it owned the property, Arvida Corporation received many requests from persons and groups of persons for permission to use the subject property. Bill Keeton and Norman Cortese testified that at different times they had been in charge of deciding whether to grant permission to persons who requested permission to use the Sabal Point property. They both testified that numbers of identified persons and groups were given permission by Arvida to use the property during the years it owned it and continuing up to the date of trial. They further testified that other persons were refused permission, and that when the Boca Raton police department received requests from individuals for permits to construct fires or hold gatherings on Sabal Point, the police department would check with Arvida to determine whether the persons had its permission to use the property. Pursuant to permission granted by Arvida, the property has been used by many persons and groups for swimming, picnics, fund-raising activities, camp-outs, scientific and experimental purposes and photography.

In 1965 the Coast Guard Auxiliary and the Deerfield Beach Rod and Reel Club obtained licenses from Arvida to use the subject property. These licenses granted permission to use the property "known as Sabal Point" including a building on the property for their purposes including the docking of rescue and fishing boats, meetings and for public educational courses on boating and safety.

The evidence showed, and it was stipulated, that Arvida promptly repaired the fence whenever it was broken and replaced no trespassing signs which were torn down from 1965 to the date of trial.

Arvida has paid real property taxes on the subject property since

it acquired the property in 1956 without any reduction for claimed public rights or any other purpose.

No evidence exists of any expenditure of public monies or use of governmental personnel to maintain, guard or supervise the beach, the footpaths or the property generally.

In 1972 the city of Boca Raton and Arvida entered into an agreement granting the city an access easement across specified portions of the property to improve and maintain the jetty and inlet. Pursuant to that agreement Arvida also deeded land in the inlet and at the jetty to the city and contributed a substantial amount of money toward the purchase of a dredge for the city to use in keeping the inlet open. In that agreement, the city agreed to keep the gates to the property locked whenever that easement was not in use by them.

There was no showing that either of the claimed paths or the claimed portion of the beach or actually any portion of the property has been regularly utilized or even occasionally utilized by a "multitudinous" number of persons.

Several of the witnesses testified that they saw other unknown persons on the property at the same time they were there, and they estimated the numbers of such persons over the objection of counsel for the defendant. The witnesses testified they did not know these other persons they saw on the property, and they would have no way of knowing whether they had received permission to be there. But even this testimony only resulted in estimates of from 10 to 12 persons on the property on weekdays and from 50 to 75 persons on weekends. The testimony offered, further, did not specifically define the boundaries of the property used by even those numbers of persons, and the numbers of persons testified to did not constitute any sort of "multitudinous" use of property by the public even if every one of them was there adversely to the owner.

There was no evidence that any injury or harm or detriment was suffered by the owners of the property from its use by persons prior to 1965. There further was no showing that the persons using the property up to that time ever did anything to manifest to the owner that they were there under a claim of right in adversity to the owner.

Inasmuch as the property claimed to have been used by the plaintiffs consists mainly of beach and unimproved realty consisting of some 22 acres, it does not appear that the use of the property caused or could have caused any detriment to the land owner, nor that the owners objected to it in any way prior to 1965.

Path 1-2-2 was interrupted by the placement of the fence and guards on the property beginning in 1965, and it became overgrown from disuse in 1965.

Any claimed eastward extension of path 1-2-2 would have been deviated for a distance of 50 to 100 feet for a period of several years after 1953 by 35-foot high piles of loose sand that were located at the edge of the inlet, spilling sand over into the inlet at times.

Path 1-2-2 does not connect to a public place at its southeast end as established by the evidence, as there is no evidence to establish a connection between its southeast termini and the dry sand beach seaward of the natural vegetation line by any definite route, width and termini.

Path 1-2-2 was shown by testimony and certified right-of-way deeds and maps to include a portion that was between the state right-of-way boundary and the paved portion of the state road. Exhibit 34, an overlay used with plaintiffs' Exhibit 2, shows this portion to have been state property from 1939 to 1963.

Path 1-2-2 has not had a terminus at a public place at the northwestern end since 1963 when Old State Road A1A was vacated and deeded to Arvida Corporation by the state of Florida.

As the claimed path as delineated by plaintiffs' testimony would not terminate in nor connect with a public place, it would as a practical matter be inaccessible to the public as a matter of legal right imposing a substantial burden on the subject property while benefiting no one.

The natural vegetation on the subject property on its southern end was destroyed beginning about 1953 by construction activity as well as the aforementioned sand piles and other materials dredged from the inlet at the south end of the beach. The court finds that the line drawn on plaintiffs' Exhibit 2 and labeled as the natural vegetation line accurately establishes that boundary on the subject property.

No evidence was adduced at trial that use by members of the public injured the defendant's land.

Relying primarily upon the testimony of James Gallogly and Enid Brennan, the court finds that the plaintiffs have proved by sufficient proof that there was use by the public of path 1-2-2 that was open, notorious, continuous and uninterrupted from 1942 to 1965 so that, had the other requirements been met, a prescriptive right would have vested in the public in path -1-22 in 1962.

Regarding the claimed portion of the beach, using the tests set forth in *City of Daytona Beach v. Tona-Rama, Inc.*, 294 So.2d 73 (Fla. 1974), the court finds that the plaintiffs' evidence was insufficient to prove prescriptive rights and insufficient to establish customary rights.

Because the court finds for Arvida on other grounds, it is not necessary for the court to enter findings or conclusions on the defense of laches.

Considering the facts and the law, the court concludes —

1. The court has jurisdiction of this matter and over the parties hereto.

2. This matter was properly brought as a class action and the representative plaintiffs have adequately represented the interests of the members of the plaintiff class which consists of all parties having or claiming to have any right, title or interest in the subject property described as Exhibit A to the complaint under the theories of prescriptive or customary rights and all persons who have used the alleged paths or beach areas.

3. Notice of the pendency of this action was given to the members of the class by the publication of notice as directed by the court in the Boca Raton News and the Palm Beach Sun Sentinel. Further, defendant mailed written notice to the persons listed on its notice of mailing filed of record herein. The court finds that adequate notice has been given to all potential members of the class. No objections to the representation of the class by the representative plaintiffs herein or their counsel nor requests to intervene in this action have been received by the clerk as a result of these published and mailed notices.

4. The elements of public prescriptive rights are a continuous, uninterrupted, open and notorious public use of property for the prescriptive period of at least twenty years prior to the institution of the action or obstruction of the property. Such use must be adverse to the interest of the owner and not permissive. *Downing v. Bird,* 100 So.2d 57 (Fla. 1958); *City of Daytona Beach v. Tona-Rama, Inc.,* supra.

5. When a public prescriptive access easement or roadway is claimed, the easement must have a reasonably certain route, termini, location and width, and it must terminate at both ends in a public place. *Downing v. Bird,* 100 So.2d 57 (Fla. 1958); *Stevens v. Sterling,* 2 Fla. Supp. 67 (Cir. Ct. Lake Co. 1949), aff'd. en banc without opinion, 41 So.2d 903 (Fla. 1949); 1 Fla. Jur., *Adverse Possession,* §54.

6. The party claiming public prescriptive rights, in this case the plaintiffs, have the burden of proving each of the essential elements of public prescriptive rights by clear and positive proof and not by loose, uncertain testimony which necessitates resort to mere conjecture. *Downing v. Bird,* 100 So.2d 57 at 64; *J. C. Vereen & Sons v. Houser,* 167 So. 45 (Fla. 1936).

7. Acquisition of prescriptive rights, public or private, is not favored by the law and any doubts as to the creation of such rights must be resolved in favor of the landowner. *Downing v. Bird,* 100 So.2d 57 (Fla. 1958).

8. In Florida, a strong presumption exists that any use of land is subordinate to the title of the true owner and with his express or implied permission. The burden is upon the parties claiming prescriptive rights to prove that the use by the public is against the interest of the landowner and injurious to him. There must be an actual invasion of the landowner's rights, for, unless one loses something, the other gains nothing. *J. C. Vereen & Sons v. Houser,* 167 So. 45 at 47 (Fla. 1936); *Downing v. Bird,* supra; *City of Daytona Beach v. Tona-Rama, Inc.,* supra; *Cooper v. Davis,* 156 So.2d 169 (Fla. 2d DCA 1963).

9. The deed from the state of Florida to Arvida conveyed all interest of the state in the former right-of-way of Old State Road A1A and no showing was made to attack the validity of that deed.

10. No rights under the prescriptive or customary use theories alleged could have been established in the plaintiff class in any property within the right-of-way boundaries of Old State Road A1A between 1939 and 1963 because it was the property of the state of Florida. *Winthrop v. Wadsworth,* 42 So.2d 541 (Fla. 1949); *Waterman v. Smith,* 94 So.2d 186 (Fla. 1957); 1 Fla. Jur., *Adverse Possession,* §54; *Mays v. Kirk,* 414 F.2d 131 (5th Cir. 1969) (construing Florida cases); 25 Am.Jur.2d, *Easements & Licenses,* §41; Annotation, 55 A.L.R.2d 578.

11. When Old State Road A1A was vacated by deed, claimed path 1-2-2 or any other path that had a terminus on the vacated portion of the old road was extinguished as they were severed from their former terminus in a public place. *Stevens v. Sterling,* supra; 1 Fla. Jur., *Adverse Possession,* §54 at 586.

12. When Old State Road A1A was vacated and the purpose of the alleged easements for public access from the old road to the beach ended, the alleged easements were extinguishd by operation of law. 2 Thompson Real Property §447 (1961); *Hudson v. American Oil Co.,* 152 F.Supp. 757 (E.D.Va. 1957); *American Oil Co. v. Leaman,* 101 S.E.2d 540 (Va. 1958); *Holden v. Palitz,* 154 N.Y.S.2d 302 (1956); *Atlantic & N.C.R. Co. v. Way,* 90 S.E. 937 (N.C. 1916); *Town of Freedom v. Norris,* 27 N.E. 869 (Ind. 1891).

13. A former state road cannot be regarded as being a "public place" after it has been conveyed by the state to a private party.

14. Prescriptive rights cannot be established to pass over a tract of land generally, except for beaches which consist of the soft sand

which does not support vegetation and are seaward of the natural vegetation line. *City of Daytona Beach v. Tona-Rama, Inc.,* 271 So.2d 765-766 (1st DCA 1972), rev'd on other grounds, 294 So.2d 73 (Fla. 1974); *State ex rel. Thornton v. Hay,* 462 P.2d 671 (Ore. 1969); *State Highway Commission v. Bauman,* 517 P.2d 1202 (Ore. 1974); *Downing v. Bird,* supra; *Sunnybrook Groves, Inc. v. Hicks,* 113 So.2d 239 (2d DCA 1959).

15. Neither the plaintiffs nor the defendant has cited any case in which rights to use footpaths were established under the customary rights doctrine; in Florida, the only rights recognized under that doctrine were in beaches.

16. Plaintiffs, through their counsel, have abandoned all claims to access paths across the subject property except the path designated as 1-2-2 on plaintiffs' Exhibit 2.

17. The only evidence adduced as to use of the beach was as to that portion between the jetty or inlet on the south and the first red mark placed on plaintiffs' Exhibit 2 to the north, and the plaintiffs' amended their pleadings to conform to the evidence, thus, claims to other portions to the beach on the subject property have been waived.

18. The establishment of customary rights requires proof as to a longer period of time than prescriptive rights as the former requires proof of use from "time immemorial" whereas the latter requires proof of use for twenty years.

19. Prior to trial the plaintiffs represented to the court that the prescriptive period at issue for the establishment of rights in footpaths was the twenty years immediately preceding the filing of the complaint in this cause, but at the close of the plaintiffs' case, the plaintiffs contended that they had established the acquisition of prescriptive rights during the period from 1942 to 1962, the defendant contends that this change in position should not be permitted, but the court declines to rule upon this contention in view of the court's other decisions and because the plaintiffs' motion to conform their pleadings to the proof was granted at the end of the trial without objection.

20. Claims to prescriptive easements in the unorganized general public can be barred by adverse possession if the property is held by the adverse possessor under a recorded deed and has been enclosed by a substantial fence for seven years or longer. Florida Statutes §95.16; *Mumaw v. Roberson,* 60 So.2d 741 (Fla. 1952); *Munn v. Ratecliff,* 446 S.W.2d 664 (Ark. 1969); *Weir v. Revo Trucks,* 500 S.W.2d 923 (Ark. 1973); *Lee v. Smith,* 484 S.W.2d 38 (Mo. App. 1972); *Porter v. Huff,* 257 S.W. 393 (Ark. 1924); *Brooks v. Reedy,* 407 S.W. 2d 378 (Ark. 1966); *Lusby v. Herndon,*

361 S.W.2d 21 (Ark. 1962); *Nelms v. Steelhammer,* 283 S.W.2d 118 (Ark. 1955).

21. The six-foot high chain link fence placed on the subject property in 1965 constituted a "substantial enclosure." Fla. Stat. §95.16; *Baugher v. Boley,* 58 So. 980 (Fla. 1912); *Wicker v. Williams,* 189 So. 30 (Fla. 1939); *Tampa Mortgage & Title Co. v. Smythe,* 109 So.2d 202 (Fla. App. 2d 1959).

22. The fact that there was an opening or break in a fence does not preclude a finding that the property was substantially enclosed when there was a conspicuous effort to maintain a fence around the land commensurate with the attending circumstances for the obvious purpose of exercising rights of ownership of the land and to use the land in a way to which it was suited. *Kerrigan v. Thomas,* 281 So.2d 410 (Fla. App. 1st 1973), cert. denied, 287 So.2d 97 (Fla. 1973); *Baugher v. Boley,* 58 So. 980 (Fla. 1912).

23. After a substantial enclosure is placed on property, the other party has seven years to institute legal proceedings or his claims are barred. As Arvida maintained the fence for seven years while holding the property under a recorded deed and paying real estate taxes, as well as engaging in numerous other activities of record evidencing it to be the owner of the property, adverse possession bars the plaintiffs' claims to any footpaths across the subject property. Fla. Stat. §95.16. Adverse possession under Fla. Stat. §95.16 may be exercised against a public prescriptive right of the kind asserted here. *Brooks v. Reedy,* supra, and cases cited above at paragraph 20.

24. Because the court finds for Arvida on other grounds, it is not necessary to decide whether adverse possession would bar plaintiffs' claims to rights in the beach.

25. The plaintiffs have failed to establish prescriptive rights in path 1-2-2 because they failed to establish that its use was adverse and because the claimed path as established by their evidence did not terminate in a public place at either the northwestern nor the southeastern end as shown on plaintiffs' Exhibit 2.

26. The fact that unknown persons were seen on the property and the number of such persons establishes nothing about the intensity of public adverse use, as use or possession is presumed to have been with the permission of the owner and substantial evidence in this case showed that permission was granted to a number of persons and groups to use the property. Thus, the plaintiffs have failed to meet their burden of negating the presumption with clear and positive proof. *Downing v. Bird,* 100 So.2d 57, 64 (Fla. 1958).

27. Customary public rights require a showing that the use of land is (1) ancient, (2) reasonable and peaceful, (3) exercised

without interruption, (4) of certain boundaries, (5) obligatory or compulsory, (6) not inconsistent with other customs or law, and (7) by a multitudinous number of persons. *Thornton v. Hay*, 462 P.2d 671 (Ore. 1969) *City of Daytona Beach v. Tona-Rama, Inc.*, supra.

Upon the foregoing findings and conclusions, the court finds that judgment shall be entered in favor of the defendant and against the plaintiffs, dismissing all of the plaintiffs' claims in suit and further granting the relief prayed for by the defendant, declaring that the subject property is free and clear of any rights in the plaintiff class.

It is accordingly ordered, adjudged and decreed that —

1. This matter was properly brought as a class action and the representative plaintiffs have adequately represented the interests of the members of the plaintiff class which consists of all parties having or claiming to have any right, title or interest in the subject property described more fully in Exhibit A hereto under the theories of prescriptive or customary rights and all persons who have used the alleged paths or beach areas.

2. The defendant, Arvida Corporation, is hereby declared and adjudged to be the owner in fee simple of the property described in the amended complaint, situate, lying and being in Palm Beach County, Florida and more fully described in Exhibit A hereto.

3. The equities of the cause are with the defendant, Arvida Corporation, and against the plaintiffs and the class represented by plaintiffs.

4. The defendant, Arvida Corporation's, title to said property be, and the same is hereby established, and the prescriptive and customary claims, or alleged claims, of the plaintiffs and the class represented by the plaintiffs to footpaths, roadways or access ways or any portion of the beach on said property be, and the same are hereby barred, removed and adjudged not to constitute clouds upon the defendant's title to said property.

5. Any right, title or interest claimed in and to said property by the plaintiffs and the class represented by plaintiffs or by any individual plaintiff or any member of the class represented by plaintiffs be, and the same is hereby, cancelled and annulled, and the plaintiffs and all members of the class represented by plaintiffs are hereby enjoined and restrained from asserting or attempting to assert any right, title, interest, claim or demand in or to said property, or any part thereof.

6. The defendant shall be awarded the costs of this action upon motion therefor.